RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 11a0029p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

AMERICAN CIVIL LIBERTIES UNION OF OHIO
FOUNDATION, INC.,

        *Plaintiff-Appellee*,

    *v.*

JAMES DEWEESE,

        *Defendant-Appellant.*

No. 09-4256

———————————

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 08-02372—Patricia A. Gaughan, District Judge.

Argued: December 1, 2010

Decided and Filed: February 2, 2011

Before: SILER, CLAY, and GIBBONS, Circuit Judges.

———————————

**COUNSEL**

———————————

**ARGUED:** Francis J. Manion, AMERICAN CENTER FOR LAW AND JUSTICE,
New Hope, Kentucky, for Appellant. Michael T. Honohan, LAW OFFICE, Rocky
River, Ohio, for Appellee. **ON BRIEF:** Francis J. Manion, Geoffrey Richard Surtees,
AMERICAN CENTER FOR LAW AND JUSTICE, New Hope, Kentucky, Edward
Lawrence White, AMERICAN CENTER FOR LAW AND JUSTICE, Ann Arbor,
Michigan, for Appellant. Michael T. Honohan, LAW OFFICE, Rocky River, Ohio,
Carrie L. Davis, AMERICAN CIVIL LIBERTIES UNION OF OHIO, Cleveland, Ohio,
for Appellee. Benjamin D. DuPre, FOUNDATION FOR MORAL LAW, Montgomery,
Alabama, for Amicus Curiae.

———————————

**OPINION**

———————————

CLAY, Circuit Judge. Defendant James Deweese appeals from a judgment
entered on October 6, 2009 by the United States District Court for the Northern District

1

of Ohio. The district court granted Plaintiff American Civil Liberties Union of Ohio Foundation, Inc.'s summary judgment motion for declaratory and injunctive relief, holding that the poster Defendant hung in his Richland County, Ohio courtroom violated the Establishment Clauses of the United States and Ohio Constitutions. For the reasons stated below we **AFFIRM** the district court's judgment.

## STATEMENT OF FACTS

In July of 2000, Defendant James DeWeese, a duly elected judge in the General Division of the Common Pleas Court in Richland County, Ohio, created and hung two posters in his courtroom, one of the Bill of Rights and one of the Ten Commandments. The American Civil Liberties Union ("ACLU") brought an action against Judge DeWeese in the United States District Court for the Northern District of Ohio seeking a declaration that the Ten Commandments poster violated the Establishment Clause, and requesting an injunction preventing Judge DeWeese from continuing to hang the poster in his courtroom. Both the district court and the United States Court of Appeals for the Sixth Circuit ruled in favor of the ACLU, declaring the hanging of the poster in the courtroom unconstitutional and enjoining Judge DeWeese from continuing to display it in his courtroom. *ACLU of Ohio v. Ashbrook*, 211 F. Supp. 2d 873 (N.D. Ohio 2002); *ACLU of Ohio Found., Inc. v. Ashbrook*, 375 F.3d 484 (6th Cir. 2004). Judge DeWeese thereafter removed the Ten Commandments poster from his courtroom.

In June 2006, Defendant created a second poster ("the poster") which he hung in his courtroom containing the Ten Commandments entitled "Philosophies of Law in Conflict." Immediately under the title on the poster are three numbered comments:

> 1. There is a conflict of legal and moral philosophies raging in the United States. That conflict is between moral relativism and moral absolutism. We are moving towards moral relativism.
>
> 2. All law is legislated morality. The only question is whose morality. Because morality is based on faith, there is no such thing as religious neutrality in law or morality.
>
> 3. Ultimately, there are only two views: Either God is the final authority, and we acknowledge His unchanging standards of behavior. Or man is

the final authority, and standards of behavior change at the whim of individuals or societies.  Here are examples.

(R. 17, Def. Opp'n to Mot. for Summ. J., Ex. A-3.)

Below these three comments are two columns covering the majority of the poster, one entitled "Moral Absolutes: The Ten Commandments," and the other entitled "Moral Relatives: Humanist Precepts."  *Id.*  Under the "Moral Absolutes" column are listed the following:

> I am the LORD your God. . .
>
> I. You shall have no other gods before Me.
>
> II. You shall not make for yourself an idol.
>
> III. You shall not take the name of the LORD your God in vain.
>
> IV. Remember the Sabbath day, to keep it holy.
>
> V. Honor your father and your mother.
>
> VI. You shall not murder.
>
> VII. You shall not commit adultery.
>
> VIII. You shall not steal.
>
> IX.  You shall not bear false witness against your neighbor.
>
> X. You shall not covet anything that is your neighbor's.

*Id.*  Under the second, "Moral Relatives," column, set up in opposition to the first, are listed seven statements:

> I. The universe is self-existent and not created.  Man is a product of cosmic accidents, and there is nothing higher than man.  (Humanist Manifesto I)
>
> II. Ethics depend on the person and the situation.  Ethics need no religious or ideological justification.  (Humanist Manifesto II)
>
> III. There is no absolute truth. What's true for you may not be true for me.  (Humanist John Dewey)

IV. The meaning of law evolves.  "We are under a Constitution, but the Constitution is what the judges say it is."  (U.S. Sup. Ct. Justice Chas. Hughes)

V. "At the heart of liberty is the right to define one's own concept of existence, of meaning, of the universe and of the mystery of human life." (Planned Parenthood v. Casey)

VI. Personal autonomy is a higher good than responsibility to your neighbor or obedience to fixed moral duties.  (Humanist Manifesto II)

VII. Quality-of-life decisions justify assisting the death of a fetus, defective infant, profoundly disabled or terminally ill person. (Princeton U. Prof. Peter Singer)

*Id*.

At the bottom of the poster, below the two columns, is a fourth comment by Defendant:

4. The cases passing through this courtroom demonstrate we are paying a high cost in increased crime and other social ills for moving from moral absolutism to moral relativism since the mid 20th century.  Our Founders saw the necessity of moral absolutes.  President John Adams said, "We have no government armed with power capable of contending with human passions unbridled by morality and religion.  Our Constitution was made for a moral and religious people.  It is wholly inadequate for the government of any other."  The Declaration of Independence acknowledges God as Creator, Lawgiver, "Supreme Judge of the World," and the One who providentially superintends the affairs of men.  Ohio's Constitution acknowledges Almighty God as the source of our freedom. I join the Founders in personally acknowledging the importance of Almighty God's fixed moral standards for restoring the moral fabric of this nation.  Judge James DeWeese.

*Id*.  Finally, in the lower right hand corner of the frame, readers are invited to obtain from the court receptionist a pamphlet further explaining Defendant's philosophy.  *Id*.

In 2008 Plaintiff filed a motion to show cause against Defendant, arguing that Defendant violated the district court's order enjoining the first poster by displaying this poster.  The district court, however, found that as the two posters were not identical, Defendant was not in contempt of the court's order to remove the previous poster.

*ACLU v. DeWeese*, No. 08–2372, slip op. at 2 (N.D. Ohio Oct 8, 2009) (memorandum and order).

Plaintiff then filed a new suit against Defendant in the United States District Court for the Northern District of Ohio. Count One of Plaintiff's new suit was a claim for declaratory relief contending that Defendant's display of the poster violated the First and Fourteenth Amendments of the United States Constitution and 42 U.S.C. § 1983. Count Two of Plaintiff's suit requested an injunction against Defendant's continued display of the poster. Count Three requested a declaration that Defendant's display of the poster violated the Ohio Constitution. *Id*. at 3.

The parties cross-moved for summary judgment, and the district court granted Plaintiff's summary judgment motion, and denied Defendant's motion. The district court found that Defendant's display of the poster in his courtroom violated the First and Fourteenth Amendments of the United States Constitution as well as the Ohio Constitution. The district court enjoined Defendant from continuing to display the poster in his courtroom. *Id*. at 23.

Defendant appealed the district court's decision.

**DISCUSSION**

**I.          Standard of Review**

We review the district court's award of summary judgment *de novo*. *Binay v. Bettendorf*, 601 F.3d 640, 646 (6th Cir. 2010). The moving party is entitled to summary judgment "if the pleadings, the discovery and the disclosure materials on file, and any affidavits show there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial burden of demonstrating the absence of a material issue of fact. "[A] party seeking summary judgment always bears the initial responsibility of informing the [court] of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

## II.     Standing

### A.     Analysis

To sue in federal court a plaintiff must demonstrate that he or she has standing under Article III of the Constitution. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998). "Standing to sue requires an individual to demonstrate (1) actual or threatened injury which is (2) fairly traceable to the challenged action and (3) a substantial likelihood the relief requested will redress or prevent the plaintiff's injury." *ACLU v. Ashbrook*, 375 F.3d 484, 489 (6th Cir. 2004). *See also Steel Co.*, 523 U.S. at 103. Moreover, the ACLU, as a "voluntary membership organization has standing to sue on behalf of its members when (a) its members otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires participation of individual members in the lawsuit." *Id*. at 489 (internal citations omitted).

In suits bought under the Establishment Clause, "direct and unwelcome" contact with the contested object demonstrates psychological injury in fact sufficient to confer standing. *Id*. at 489-90 (finding that plaintiff had sufficiently demonstrated standing to challenge Ten Commandments poster in defendant's courtroom when "ACLU-Ohio . . . identified member Bernard Davis, a lawyer who travels to and must practice law within DeWeese's courtroom from time to time. There, Davis has and would continue to come into direct, unwelcome contact with the Ten Commandments display."); *Washegesic v. Bloomingdale Pub. Schs.*, 33 F.3d 679, 681-82 (6th Cir. 1994) (holding that plaintiff had standing to challenge a portrait of Jesus in the hallway of his high school, even after graduation. As plaintiff "still visite[d] the school and will confront the portrait whenever he is in the hall . . . plaintiff claime[d] that . . . he continued to suffer actual injury."); *Adland v. Russ*, 307 F.3d 471, 478 (6th Cir. 2002) (holding that plaintiffs had standing to challenge a Ten Commandments display at the state capitol as plaintiffs "frequently

travel to the State Capitol to engage in political advocacy for a variety of organizations and that they will endure direct and unwelcome contact with the Ten Commandments Monument.").[1]   In this case, Plaintiff demonstrates injury through the affidavit of Bernard Davis, a member of the ACLU whose affidavit also supported the ACLU's standing in its prior case against Defendant. *Ashbrook*, 375 F.3d at 489-90. The Davis affidavit states that he is,

> an attorney licensed to practice law in the State of Ohio . . . . As an attorney in Richland County I frequently and routinely appear in Richland County Common Pleas Court, and in the courtroom of Judge James DeWeese.  I have witnessed on many occasions the poster displayed entitled "Philosophies of Law in Conflict" containing a version of the Ten Commandments . . . and the expressed espousal of a legal philosophy which is, in my opinion, clearly a religious message.  The display offends me personally, in that I perceive it as an inappropriate expression of a religious viewpoint as well as a display of a sacred text in a public building.

(R. 16, Pl.'s Mot. for Summ. J., Ex. 4.)

The Davis affidavit supports the ACLU's standing.  Davis states that he personally has and does come in direct contact with Defendant's poster in the course of his professional work, and that this contact is unwelcome due to the poster's allegedly religious content.[2]  Furthermore, the Establishment Clause violation of which Davis complains is germane to the interests that the ACLU seeks to protect, as Davis' civil

---

[1]In raising the issue of standing, Defendant argues that in *Valley Forge Christian Coll. v. Ams. United for Separation of Church and State*, 454 U.S. 464 (1982), the Supreme Court held that psychological injury can never be the basis for Article III standing. (Br. of Appellant at 14.) This Court has consistently rejected this argument. *Ashbrook*, 375 F.3d at 489 n.3 ("we do not take the Supreme Court's decision in *Valley Forge Christian College v. Americans United for the Separation of Church and State* to stand for the proposition that psychological injury can *never* be a sufficient basis for the conferral of Article III Standing."); *Washegesic*, 33 F.3d at 682 (stating that whether plaintiffs have standing based on psychological injury "depends on the directness of the harm. *Valley Forge* was a citizens suit . . . . Their grievance had a vicarious quality . . . . They had no direct contact with the dispute."); *Hawley v. City of Cleveland*, 773 F.2d 736, 740 (6th Cir. 1985).

[2]Defendant argues that whether Davis suffered actual injury sufficient to confer standing is a question of material fact that should not be resolved on summary judgment. However, although "[t]he party invoking federal jurisdiction bears the burden of establishing" the elements of standing, to support standing at the summary judgment stage a plaintiff must only "set forth by affidavit or other evidence specific facts which for purposes of the summary judgment motion will be taken as true." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).  Davis' affidavit averring psychological injury is sufficient to establish injury in fact for the purposes of determining standing in this suit.

liberties are at issue, and "the ACLU-Ohio's stated purpose [is] the preservation of the constitutional separation of church and state." *Ashbrook*, 375 F.3d at 490. Finally, Davis' participation is not required to pursue this suit.

### B.    Summary

Plaintiff has standing to sue under the Establishment Clause. Therefore, we **AFFIRM** the district court's decision with respect to standing, and address the merits of Plaintiff's complaint.

### III.    Establishment Clause of the First Amendment

The Establishment Clause of the First Amendment, applied to the states by incorporation into the Fourteenth Amendment, *Everson v. Bd. of Educ.*, 330 U.S. 1 (1947), states, "Congress shall make no law respecting an establishment of religion." U.S. Const. amend. I, cl. 1. This language is "at best opaque," *Lemon v. Kurtzman*, 403 U.S. 602, 612 (1971) , and far from self-defining. Courts are, therefore, in need of some interpretive help in determining the bounds of the Establishment Clause. *See McCreary Cnty. v. ACLU of Ky.*, 545 U.S. 844, 859 n.10 (2005) ("*McCreary*").[3]

In *Lemon* the Supreme Court set out a three part test for determining whether government conduct violated the Establishment Clause. The test "ask[s] (1) [whether] the challenged government action has a secular purpose; (2) [whether] the action's primary effect neither advances nor inhibits religion; and (3) [whether] the action fosters an excessive entanglement with religion." *Ashbrook*, 375 F.3d at 490 (quoting *Lemon*, 403 U.S. a 612-13). *See also McCreary*, 545 U.S. at 859; *Stone v. Graham*, 449 U.S. 39, 40 (1980); *ACLU v. McCreary Cnty.*, 607 F.3d 439, 455-56 (6th Cir. 2010) ("*McCreary*

---

[3]Defendant's appellate brief includes several quotes and facts from American history to justify hanging the poster in his courtroom. However, the Supreme Court has stated that "[t]here have been breaches of this command [separating church and state] throughout this Nation's history, but they cannot diminish in any way the force of the command." *Cnty. of Allegheny v. ACLU*, 492 U.S. 573, 604-05 (1989). Moreover, the Supreme Court's more recent decision in *McCreary* discounted the value of historical evidence relating to the Establishment Clause's parameters. The Supreme Court stated that historical evidence shows that "there was no common understanding about the limits of the establishment prohibition . . . . What the evidence does show is a group of statesmen, like others before and after them, who proposed a guarantee with contours not wholly worked out, leaving the Establishment Clause with edges still to be determined." *McCreary*, 545 U.S. at 879-81.

*II*"); *ACLU v. Mercer Cnty.*, 432 F.3d 624, 635 (6th Cir. 2005); *ACLU v. McCreary Cnty.*, 354 F.3d 438, 446 (6th Cir. 2003) ("*McCreary I*"); *Adland*, 307 F.3d at 479; *Baker v. Adams Cnty.*, 310 F.3d 927, 929 (6th Cir. 2002); *Washegesic*, 33 F.3d at 683. Both this Court and the Supreme Court have questioned the *Lemon* test's utility in Establishment Clause cases. *Van Orden v. Perry*, 545 U.S. 677, 685-86 (2005); *Lynch v. Donnelly*, 465 U.S. 668, 679 (1984); *Mercer*, 432 F.3d at 635-36. Indeed, Establishment Clause cases do not readily lend themselves to neat disposition through categorical bright line tests, *Van Orden*, 545 U.S. at 683 ("Our cases, Janus-like, point in two directions in applying the Establishment Clause."); *Waltz v. Tax Comm'n of the City of New York*, 397 U.S. 664, 668 (1970) ("In attempting to articulate the scope of the two religion Clauses, the Court's opinions reflect the limitations inherent in formulating general principles on a case-by-case basis."), and have often produced inconsistent holdings. *Compare, e.g., Van Orden*, 545 U.S. at 684 n.3 ("Despite Justice Stevens' recitation of occasional language to the contrary, we have not, and do not, adhere to the principle that the Establishment Clause bars any and all governmental preference for religion over irreligion."), *with McCreary*, 545 U.S. at 860 ("The touchstone for our analysis is the principle that the First Amendment mandates governmental neutrality between religion and religion, and between religion and nonreligion."). Nevertheless, *Lemon* remains the law governing Establishment Clause cases. *McCreary II*, 607 F.3d at 445 ("As was true the last time we heard this matter, the governing standard for determining whether a particular government action violates the Establishment Clause remains *Lemon v. Kurtzman*.").

In the years since the Supreme Court announced the *Lemon* test, the Supreme Court has refined its first two prongs. *Lemon*'s purpose prong "is now the predominant purpose test." *Mercer*, 432 F.3d at 635. *Lemon*'s second prong, reformulated as the "endorsement test, asks whether the government action has the purpose or effect of endorsing religion." *Id*. *Lemon*'s third prong remains the excessive entanglement test. Failure under any of *Lemon*'s three prongs "deems governmental action violative of the Establishment Clause." *McCreary I*, 354 F.3d at 458.

### A.      Purpose Test

In determining the government's purpose under the first prong of the *Lemon* test, "a [government actor's] stated reasons will generally get deference." *McCreary II*, 607 F.3d at 445 (quoting *McCreary*, 545 U.S. at 864).   However, "the secular purpose required has to be genuine, not a sham, and not merely secondary to a religious objective." *Id*. Thus, "[t]he eyes that look to purpose belong to an objective observer, one who takes account of the traditional external signs that show up in the . . . official act," from "readily discoverable fact." *McCreary*, 545 U.S. at 862. "[T]he objective observer is considered to have reasonable memories, and Supreme Court precedents sensibly forbid an observer to turn a blind eye to . . . context . . . . [R]eviewing courts must look with the eye of an observer familiar with the history of the government's actions and competent to learn [what] history has to show." *McCreary II*, 607 F.3d at 446.

Under the *Lemon* purpose inquiry, courts have consistently found the history and context of the action significant. "The [purpose] inquiry, of necessity, turns upon the context in which the contested object appears." *McCreary*, 545 U.S. at 868 (internal quotations omitted). In evaluating the purpose of posting a religious text, "it will matter to [the] objective observer[] whether posting the Commandments follows on the heels of displays motivated by sectarianism, or whether it lacks a history demonstrating that purpose." *Id*. at 866 n. 14. *See also McCreary II*, 607 F.3d at 446-49 (finding that the displays' extended sectarian history in which counties reformulated displays on several occasions "would probably lead an objective observer to suspect that the Counties were simply reaching for any way to keep a religious document on the walls of courthouses constitutionally required to embody neutrality.") (internal citations omitted). This Court is "compel[led] to consider the government's past violations of the Establishment Clause when evaluating its present conduct." *McCreary I*, 354 F.3d at 457 (finding "it significant that Defendants' original displays, containing only the Ten Commandments, were erected in violation of the Supreme Court's clear ruling in *Stone*. This defiance . . .

imprinted the Defendants' purpose, from the beginning with an unconstitutional taint.") (internal citations and quotations omitted).

Defendant's stated purpose for hanging the poster is "to express [his] views about two warring legal philosophies that motivate behavior and the consequences that [he] ha[s] personally witnessed in [his] 18 years as a trial judge of moving to a moral relativist philosophy and abandoning a moral absolutist legal philosophy." (R. 17, Def. Opp'n to Mot. for Summ. J., Ex. A, ¶ 2.) It is questionable whether Defendant has articulated a facially secular purpose. However, assuming for the sake of argument that Defendant has stated a facially secular purpose, and giving that stated purpose its due deference, the history of Defendant's actions demonstrates that any purported secular purpose is a sham.

In 2000, Defendant hung a Ten Commandments poster in his courtroom. Judge DeWeese's stated purpose in hanging this poster was:

> to use [it] occasionally in educational efforts when community groups come to the courtroom and ask [him] to speak to them. These documents are useful in talking about the origins of law and legal philosophy and about the rule of law as opposed to the rule of man. [DeWeese] . . . chose the Ten Commandments because they were emblematic of moral absolutism and [Deweese] chose them to express the belief that law comes either from God or man, and to express his belief that God is the ultimate authority.

*Ashbrook*, 375 F.3d at 491. This Court agreed with the district court in *Ashbrook* that DeWeese's purpose in posting this first Ten Commandments poster was:

> (1) to instruct individuals that our legal system is based on moral absolutes from divine law handed down by God through the Ten Commandments and (2) to help foster debate between the philosophical position of moral absolutism (as set forth in the Ten Commandments) and moral relativism in order to address what he perceives to be a moral crisis in this country.

*Id*. at 492. Therefore, "[d]espite his stated intent to use the display for educational purposes," this Court concluded that "DeWeese has not described a role for the Ten Commandments poster in his educational errand other than to admonish participants in

talks or programs in his courtroom to look to the Commandments as a source of law.  His own testimony belie[d] the secular purpose he wishe[d] to ascribe to it." *Id*.  Finding that "DeWeese's purpose in posting the Ten Commandments revealed a predominate non-secular purpose for the display," this Court stated that "Judge DeWeese's display of the Ten Commandments violate[d] the Establishment Clause of the First Amendment." *Id*.  This Court thus affirmed an order of the district court ordering Judge DeWeese to remove the poster of the Ten Commandments from his courtroom. *Ashbrook*, 375 F.3d at 495.  Defendant complied with this injunction.  However, in 2006 Defendant created the poster at issue in this case, which includes the text of the Ten Commandments as well as religious editorial commentary.

Defendant's history of Establishment Clause violation casts aspersions on his purportedly secular purpose in hanging the poster in his courtroom.  So too do the similarities between Defendant's stated purpose in this case, and his unconstitutional purpose in *Ashbrook*.  Defendant attempts to distinguish his purpose in hanging the poster from his purpose in hanging the poster in *Ashbrook*.  He states that his "purpose was not clear from looking at the display [in *Ashbrook*] and was misinterpreted by the district court as a religious purpose.  Consequently, [he] was careful in the new 2006 display to explain his philosophical purpose in the text of the poster."  (R. 17, Def. Opp'n to Mot. for Summ. J., Ex. A, ¶ 2.).  However, Defendant's statements are unconvincing.  As borne out by this Court's decision in *Ashbrook*, Defendant's "views about warring legal philosophies" and his concern over society's "abandoning a moral absolutist legal philosophy," (R. 17, Def. Opp'n to Mot. for Summ. J., Ex. A, ¶ 2.), that support his decision to hang the poster are based on his belief that "our legal system is based on moral absolutes from divine law handed down by God through the Ten Commandments." *Ashbrook*, 375 F.3d at 492.  This plainly constitutes a religious purpose in violation of *Lemon*'s first prong.

Although the history of Defendant's Establishment Clause violations is sufficient to reveal his religious purpose, the texts of the challenged poster and Defendant's supplementary pamphlet are also illuminating.  Courts have found the challenged text

itself significant in determining purpose under *Lemon*. *McCreary*, 545 U.S. at 868 ("Where the text is set out, the insistence of the religious message is hard to avoid in the absence of a context plausibly suggesting a message going beyond an excuse to promote the religious point of view."); *Stone*, 449 U.S. at 41-42; *Ashbrook*, 375 F.3d at 491. In addition to a redacted text of the Ten Commandments, the poster includes editorial statements by Defendant. These include religious statements such as "God is the final authority, and we acknowledge His unchanging standards of behavior," and "I join the Founders in personally acknowledging the importance of Almighty God's fixed moral standards for restoring the moral fabric of this nation," among others. (R. 17, Def. Opp'n to Mot. for Summ. J., Ex. A - 3.) Similarly, in his supplemental pamphlet Defendant states,

> We are engaged in a great civil war of legal philosophies in the United States . . . . The historically established philosophy bases its distinctions between right and wrong on the God of the Bible. It holds that God has defined for humanity's own good and happiness what is right and wrong and that those standards cannot be altered or abolished. It is a standard of moral absolutes.

(R. 16, Pl.'s Mot. for Summ. J., Ex. 5-A.) Defendant's definition of moral absolutes as the standards of "the God of the Bible," (R. 16, Pl.'s Mot. for Summ. J., Ex. 5-A.), coupled with his statements regarding the "necessity of moral absolutes," (R. 17, Def. Opp'n to Mot. for Summ. J., Ex. A - 3.), reveal Defendant's religious purpose.

Although Defendant attempts to veil his religious purpose by casting his religious advocacy in philosophical terms, "[a] finding of religious purpose is militated by the blatantly religious content of the display[]." *McCreary I*, 354 F.3d at 455. Replacing the word religion with the word philosophy does not mask the religious nature of Defendant's purpose. The poster's patently religious content reveals Defendant's religious purpose, violating *Lemon*'s first prong, and thus the Establishment Clause.

**B.      Endorsement Test**

Although "failure under any one of the *Lemon* prongs deems governmental action violative of the Establishment Clause," *McCreary I*, 354 F.3d at 458, and Defendant violated the Establishment Clause based on *Lemon*'s first prong, its is also helpful to consider *Lemon*'s second, endorsement, prong.

As reformulated in recent years, the second prong of *Lemon* asks whether "the government action has the purpose or effect of endorsing religion." *Mercer*, 432 F.3d at 635.

> Under the endorsement test, the government violates the Establishment Clause when it acts in a manner that a reasonable person would view as an endorsement of religion. This is an objective standard, similar to the judicially-created reasonable person standard of tort . . . . [T]he inquiry here is whether the reasonable person would conclude that [defendant's] display has the effect of endorsing religion.

*Id*. at 636. *See also McCreary I*, 354 F.3d at 458 (internal citations omitted). In this case, as in the prior case involving Judge DeWeese, the Court asks,

> whether a reasonable observer acquainted with the text, history, and implementation of DeWeese's display of the Ten Commandments in his courtroom would view it as a state endorsement of religion. The inquiry must be viewed under the totality of the circumstances surrounding the display, including the contents and the presentation of the display, because the effect of the government's use of religious symbolism depends on context.

*Ashbrook*, 375 F.3d at 492.

> In determining what constitutes a constitutionally permissible display of the Ten Commandments in a governmental building . . . the symbols must be interconnected in a manner that is facially apparent to the observer and the interconnection must be secular in nature. When secular and non-secular items are displayed together, we consider whether the secular image detracts from the message of endorsement; or if rather, it specifically links religion and civil government.

*Id*. at 493.

In contrast to the Ten Commandments displays in *Stone*, the *McCreary* cases, *Van Orden*, *Mercer*, and *Ashbrook*, the poster in this case is not merely a display of the Ten Commandments in Defendant's courtroom. It sets forth overt religious messages and religious endorsements. It is a display of the Ten Commandments editorialized by Defendant, a judge in an Ohio state court, exhorting a return to "moral absolutes" which Defendant himself defines as the principles of the "God of the Bible." The poster is an explicit endorsement of religion by Defendant in contravention of the Establishment Clause.

The poster includes both the Ten Commandments, and seven secular "Humanist Precepts," (R. 17, Def. Opp'n to Mot. for Summ. J., Ex. A-3), in addition to four editorial comments written by Defendant. Defendant's prior poster of the Ten Commandments was invalidated partially because we found that "DeWeese's display conveys a message of religious endorsement because of the complete lack of any analytical connection between the Ten Commandments and the Bill of Rights that could yield a unifying cultural or historical theme that is also secular for a reasonable observer." *Ashbrook*, 375 F.3d at 494. Defendant's second poster, at issue in this case, does not suffer from the same defect. Defendant's editorial comments explicitly link the Ten Commandments and the "Humanist Precepts." The poster reads "There is a conflict of legal and moral philosophies . . . All law is legislated morality. The only question is whose . . . . Ultimately, there are only two views: Either God . . . or man . . . Here are examples." (R. 17, Def. Opp'n to Mot. for Summ. J., Ex. A-3). The poster then sets out the Ten Commandments and the "Humanist Precepts" in two opposing columns.

However, while the poster effectively links the Ten Commandments and secular principles, the poster fails the endorsement test for a different reason. To survive endorsement test scrutiny, "the interconnection [between the religious and secular displays] must be secular in nature." *Ashbrook*, 375 F.3d at 493. Here it is not. Rather, by stating that the "moral absolutes" of "the God of the Bible" are the "fixed moral standards for restoring the moral fabric of this nation," (R. 17, Def. Opp'n to Mot. for Summ. J., Ex. A-3), that should triumph in the "conflict of legal and moral philosophies

raging in the United States," the poster "specifically links religion and civil government." *Ashbrook*, 375 F.3d at 493.   Defendant's poster thus violates the Establishment Clause under *Lemon's* endorsement test.

Finally, we will not discuss *Lemon*'s third entanglement prong inasmuch as parties did not address it in their briefs.  *Brown v. Crowley*, 229 F.3d 1150 (6th Cir. 2000) (table) (noting that inadequate briefing constitutes waiver).

### C.        Summary

For the reasons discussed above, the hanging of Defendant's poster in the courtroom violates the Establishment Clause both under *Lemon*'s purpose and endorsement prongs.  Therefore, we **AFFIRM** the district court's decision.[4]

### IV.        Protected Speech Under the First Amendment

### A.        Analysis

Defendant contends that his hanging of the poster in his courtroom constitutes protected speech under the First Amendment of the United States Constitution.  The Supreme Court has stated that "there is a crucial difference between government speech endorsing religion, which the Establishment Clause forbids, and private speech endorsing religion, which the Free Speech and Free Exercise clauses protect." *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 302 (2000).  However, although Defendant is correct that "judges are not First Amendment orphans," (Br. of Appellant at 43), Defendant's hanging of the poster in his courtroom is not the private judicial speech protected by the First Amendment's Free Speech clause.  *See Republican Party of Minnesota v. White*, 536 U.S. 765 (2002) (holding unconstitutional a statute prohibiting judges running for election from expressing a view on political issues during campaigns).

---

[4]In view of our disposition of this case pursuant to the U.S. Constitution's Establishment Clause, we need not decide whether the poster is similarly violative of the Ohio State Constitution's establishment clause.

Defendant presented the identical argument to defend his first Ten Commandments poster.   We rejected this argument in *Ashbrook*, explaining:

> DeWeese's posters are situated in a courtroom, a public space, and were placed on the wall by a sitting judge charged with the decoration of that space while in office and presiding in the same courtroom.  As such, we reject DeWeese's contention that the display constitutes private religious expression protected by the Free Speech Clause, falling beyond the bounds of Establishment Clause scrutiny.  Indeed, they constituted government speech subject to the strictures of the Establishment Clause.

375 F.3d at 490 n.4.  This analysis is equally applicable and controlling in this case.

### B.     Summary

Defendant's hanging of the poster in the courtroom is not protected by the First Amendment's Free Speech Clause.   Therefore, we **AFFIRM** the district court's decision.

### CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's decision.